| | |
|---|---|
| **DISTRICT COURT, EL PASO COUNTY, COLORADO**<br>Court Address:  270 South Tejon Street<br>                          Colorado Springs, CO 80903<br>Court Phone:   719-452-5000 | DATE FILED: June 5, 2017 9:54 AM<br>FILING ID: 2DA0D14394E4A<br>CASE NUMBER: 2017CV31412 |
| **Plaintiff:**<br>IBEX, LLC,<br><br>v.<br><br>**Defendants:**<br>RIGHT AT HOME, LLC, BRIAN PETRANICK, MARGARET HAYNES, and SUSIE DUNN. | |
| *Attorneys for Plaintiff:*<br>Erin M. Jensen, #39449<br>JENSEN \| DULANEY LLC<br>444 East Pikes Peak Ave., Suite 200<br>Colorado Springs, CO  80903<br>Phone Number: (719) 362-5560<br>Fax Number:    (800) 584-9002<br>E-mail:             ejensen@jensendulaney.com | ▲ COURT USE ONLY ▲<br><br>Case No. 2017cv_____<br><br>Div. ___ |
| **COMPLAINT AND JURY DEMAND** ||

Plaintiff Ibex, LLC, by and through its attorneys, Jensen Dulaney LLC, hereby state its Complaint and Jury Demand (the "Complaint") as follows:

### PARTIES

1.      Defendant Right at Home, LLC ("RAH") is a Delaware limited liability company with its principal place of business at 6464 Center Street, Suite 150 in Omaha, Nebraska.

2.      RAH provides home care for seniors and disabled adults in hundreds of locations through the country. RAH has four franchises in Colorado.

3.      Upon information and belief, Defendant Brian Petranick ("Mr. Petranick") is an individual residing in Sarpy County, Nebraska. Mr. Petranick is the President and CEO of RAH.

EXHIBIT 3

4. Upon information and belief, Defendant Margaret Haynes ("Ms. Haynes") is an individual residing in Sarpy County, Nebraska. Ms. Haynes is the Chief Operating Officer of RAH.

5. Upon information and belief, Defendant Susie Dunn ("Ms. Dunn" and, along with RAH, Mr. Petranick, and Ms. Haynes, the "Defendants") is an individual residing in Cedar County, Nebraska. Upon information and belief Ms. Dunn is a Resale Support Manager for RAH.

6. Plaintiff Ibex, LLC ("Ibex" or "Plaintiff") is a Colorado limited liability company with its principal place of business at 9970 Pleasanton Drive in Colorado Springs, Colorado. Ibex is a franchisee of RAH.

## JURISDICTION AND VENUE

7. This Court has subject matter jurisdiction over the above-captioned matter (the "Action") pursuant to Colo. Const. Art. VI, Section 9.

8. This Court has personal jurisdiction over RAH because RAH was personally served, in accordance with C.R.C.P. 4 (e)(4)(A), in the State of Colorado on May 24, 2017.

9. This Court also has personal jurisdiction over RAH pursuant to C.R.S. § 13-1-124 because: (a) RAH regularly transacts business within the State of Colorado including, but not necessarily limited to, the regular transaction of business with its four franchisees in Colorado; and (b) RAH committed tortious acts within the State of Colorado and/or the resulting injury occurred within the State of Colorado.

10. This Court has personal jurisdiction over Mr. Petranick because he was, in accordance with C.R.C.P. 4 (e)(1), personally served with this Complaint in the State of Colorado on May 24, 2017.

11. This Court also has personal jurisdiction over Mr. Petranick pursuant to C.R.S. § 13-1-124 because: (a) Mr. Petranick regularly transacts business within the State of Colorado including, but not necessarily limited to, the regular transaction of business with RAH's four franchisees in Colorado; and (b) Mr. Petranick committed tortious acts within the State of Colorado and/or the resulting injury occurred within the State of Colorado.

12. This Court has personal jurisdiction over Ms. Haynes because she was, in accordance with C.R.C.P. 4 (e)(1), personally served with this Complaint in the State of Colorado on May 24, 2017.

13. This Court also has personal jurisdiction over Ms. Haynes pursuant to C.R.S. § 13-1-124 because: (a) Ms. Haynes regularly transacts business within the State of Colorado

including, but not necessarily limited to, the regular transaction of business with RAH's four franchisees in Colorado; and (b) Ms. Haynes committed tortious acts within the State of Colorado and/or the resulting injury occurred within the State of Colorado.

14.     This Court has personal jurisdiction over Ms. Dunn because she was, in accordance with C.R.C.P. 4 (e)(1), personally served with this Complaint in the State of Colorado on May 24, 2017.

15.     This Court also has personal jurisdiction over Ms. Dunn pursuant to C.R.S. § 13-1-124 because: (a) Ms. Dunn regularly transacts business within the State of Colorado including, but not necessarily limited to, the regular transaction of business with RAH's four franchisees in Colorado; and (b) Ms. Dunn committed tortious acts within the State of Colorado and/or the resulting injury occurred within the State of Colorado.

16.     Pursuant to C.R.C.P. 98(c), venue for this Action is proper in this Court because, *inter alia*, Defendants are non-residents and some of the events giving rise to this Action occurred in El Paso County, Colorado.

## GENERAL ALLEGATIONS

17.     Total Healthcare Staffing, Inc. is a Colorado corporation ("THS"). At all times relevant hereto, Mark Terry ("Mr. Terry") was the sole owner and president of THS.

**(RAH's Oversight of THS)**

18.     THS was a franchisee of RAH for the Colorado Springs, Colorado area and registered with RAH as franchise #1004 (the "Franchise").

19.     RAH had the contractual right and financial motivation to regularly review the original books and records of THS while THS was a franchisee of RAH.

20.     RAH's franchise royalty was determined by THS's weekly net billings.

21.     Accordingly, RAH obtained and analyzed THS's weekly financial activity for each and every week THS was a franchisee of RAH. This weekly financial analysis included, without limitation, analysis of net billings.

22.     On a monthly basis, RAH also obtained and analyzed THS's monthly and year-to-date income statements, balance sheets, statements of cash flow, and other financial information related to key performance indicators.

23.     RAH also analyzed and benchmarked THS's current and historical financial results against other RAH franchisees including, without limitation, national averages, regional averages, and peer groupings.

24.     RAH also had the contractual right and financial motivation to perform full audits of THS's financial records including, without limitation, sales reports, checks, purchase orders, invoices, payroll records, check stubs, sales tax records and returns, cash receipts and disbursement journals, and general ledgers.

25.     RAH also carefully monitored THS's franchise activities:

    (a)     to ensure that THS was following the standards of quality and performance established by RAH;

    (b)     to ensure that THS was using suppliers that were approved by RAH;

    (c)     to ensure that THS was using the supplies approved by RAH;

    (d)     to ensure that THS was properly using RAH's proprietary trade names, trademarks, logos, and commercial symbols;

    (e)     to ensure that THS was preserving the confidentiality of RAH's proprietary business processes and information;

    (f)     to ensure that THS was not modifying RAH's business system;

    (g)     to ensure that THS was conducting its required local marketing and promotion;

    (h)     to ensure that THS was contributing the required amounts to RAH's brand marketing;

    (i)     to ensure that THS maintained the required insurance coverages;

    (j)     to ensure that THS was in compliance with all state and federal regulations and licensure requirements; and

    (k)     to ensure that THS was complying with all of its obligation to RAH set forth in the franchise agreement between them.

26.     RAH also provided ongoing assistance to THS in connection with various aspects of the operation of the Franchise.

**(Theft of Customer Deposits)**

27.     In the course of its operations, THS would request and accept deposits from customers in anticipation of future services (collectively, "Customer Deposits").

28. Customer Deposits were unearned by THS and were effectively held in trust by THS. Upon termination of THS's services, THS was required to return all unearned portions of a customer deposit to the customer or the customer's estate.

29. Customer Deposits were detailed on THS's financial statements as "2040 – Customer Security Deposits."

30. From at least November 2012 to August of 2016, THS regularly and wrongfully used and distributed to Mr. Terry unearned Customer Deposits.

31. Specifically, after a customer of THS stopped using THS's services, Mr. Terry would wait a period of time to see if the customer or representatives of the customer's estate would request a return of the customer's deposit.

32. If a return was not requested, Mr. Terry would cause THS to transfer the customer's deposit to an account he controlled. On the financials of THS, the customer deposit was transferred into an account labeled "DRA." However, the customer deposit was actually transferred to Mr. Terry.

33. Mr. Terry stole over $400,000 of customer deposits that should have been returned.

34. Upon information and belief, in November of 2015 the then director of operations for THS learned of the above-listed theft and quit.

35. Upon information and belief, Defendants learned of THS's theft of Customer Deposits as a result of:

    (a) a review of THS's financial records;

    (b) a disclosure by current or former employee of THS;

    (c) inquires by a law enforcement agency;

    (d) inquires by the Colorado Department of Public Health and Environment; and/or

    (e) a confession by Mr. Terry.

**(Sale of the Franchise)**

36. Upon information and belief, the Defendants kept the theft of the Customer Deposits a secret as they were concerned, *inter alia*, about significant damage to RAH's

reputation with potential clients and its other franchisees.

37.     Upon information and belief, RAH required and/or encouraged THS to sell its Franchise in light of the criminal and/or fraudulent behavior of THS and Mr. Terry.

38.     Several key members of THS's staff left THS just days before the Franchise was put on the market in July of 2016 including, without limitation, THS's then Vice President, Greg Coopman.

39.     On or about August 25, 2016, Ibex tendered to THS a letter of intent to purchase the assets of THS and the Franchise (the "LOI").

40.     THS signed the LOI and Ibex was given a 120-day due diligence period ("Due Diligence Period").

41.     During the Due Diligence Period, Ibex was provided incomplete, misleading, and/or inaccurate information by THS and Defendants.

42.     Upon information and belief, during the Due Diligence Period, THS was being actively investigated by law enforcement for financial crimes (the "Criminal Investigation").

43.     Upon information and belief, during the Due Diligence Period Defendants were aware of the Criminal Investigation.

44.     Despite numerous meetings with Ibex's principals, Defendants never disclosed to Ibex the Criminal Investigation, the theft of Customer Deposits, or the exodus of THS's key staff members.

45.     RAH approved the sale of the Franchise from THS to Ibex.

46.     On or about November 4, 2016, Ibex and THS entered into an asset purchase agreement (the "Purchase Agreement") whereby Ibex purchase certain assets of THS and the Franchise at a closing set for December 30, 2016 (the "Closing").

47.     On or about November 4, Ibex also entered into a franchise agreement with RAH (the "Franchise Agreement").

**(Ibex's Discovery of Fraud)**

48.     In February of 2017, Ibex discovered the above-identified theft of Customer Deposits.

49.     Ibex promptly notified RAH of the theft of Customer Deposits.

50. During various exchanges between the principals of Ibex and representatives of RAH in February of 2017, Ms. Dunn essentially admitted that prior to Closing, Defendants knew of the Criminal Investigation and the theft of Customer Deposits.

## FIRST CLAIM FOR RELIEF
### (Fraud)

51. Plaintiff incorporates the preceding paragraphs by reference, as if fully set forth herein.

52. Defendants concealed and/or failed to disclose information to Ibex regarding THS and the Franchise including, without limitation, the Criminal Investigation, the theft of Customer Deposits, or the exodus of THS's key staff members.

53. The information that Defendants concealed and/or failed to disclose to Ibex was material to Ibex's purchase of THS's assets and Franchise.

54. Defendants concealed and/or failed to disclose the information with the intent of creating a false impression of the actual facts in the minds of the principals of Ibex.

55. Defendants concealed and/or failed to disclose the information with the intent that Ibex take a course of action (*i.e.*, entering into the Purchase Agreement and the Franchise Agreement) it might not have taken if it knew the actual facts.

56. Ibex entered into the Purchase Agreement and the Franchise Agreement relying on the assumption that the concealed and/or undisclosed information did not exist or was different from what it actually was.

57. Ibex's reliance was justified.

58. Defendants' fraud occurred prior to the execution of the Purchase Agreement and Franchise Agreement.

59. Defendants' fraud induced Ibex to enter into the Purchase Agreement and Franchise Agreement.

60. As a direct and proximate result of Defendants' fraud, Ibex has suffered damages in an amount to be determined at trial for which Defendants are jointly and severally liable.

WHEREFORE, Plaintiff prays for relief as stated below.

## SECOND CLAIM FOR RELIEF
### (In the alternative - Negligent Misrepresentation)

61. Plaintiffs incorporate the preceding paragraphs by reference, as if fully set forth herein.

62. While in the course of their business, Defendants made misrepresentations of material fact, without reasonable care, concerning THS and the Franchise that Defendants knew Ibex would rely upon in making its decision to enter into the Purchase Agreement and the Franchise Agreement.

63. Ibex's reliance on Defendants' misrepresentations were justified.

64. Defendants' negligent misrepresentations occurred prior to the execution of the Purchase Agreement and Franchise Agreement.

65. Defendants' negligent misrepresentations induced Ibex to enter into the Purchase Agreement and Franchise Agreement.

66. As a direct and proximate result of Defendants' negligent misrepresentations, Ibex has suffered damages in an amount to be determined at trial for which Defendants are jointly and severally liable.

WHEREFORE, Plaintiff prays for relief as stated below.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that judgment be entered in its favor and against Defendants as follows:

a. That Plaintiff recover all of its damages from Defendants for their fraud;

b. That Plaintiff recover all of its damages from Defendants for their negligent misrepresentations;

c. That Plaintiff recover from Defendants pre-judgment and post-judgment interest at applicable rates;

d. That Plaintiff recover from Defendants attorneys' fees and costs as provided by applicable statute; and

e. That the Court grant Plaintiff such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff hereby demands a jury trial, pursuant to C.R.C.P. 38, on all issues so triable.

DATED this 24th day of May 2017.

JENSEN | DULANEY LLC

Erin M. Jensen, #39449
444 East Pikes Peak Ave., Suite 200
Colorado Springs, CO  80903
*Attorneys for Plaintiff*

**Plaintiff's Addresses:**

9970 Pleasanton Drive
Colorado Springs, CO 80920